IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

```
-------------------------------------------------------X
                                                       :
STILES MACHINERY, INC.              :            3:05 CV 397 (JGM)
                                                       :
                                                       :
V.                                                     :
                                                       :
JAY LESTORTI, a.k.a. JAMES LESTORTI  :
AND                                                    :            DATE: JULY 17, 2007
BUILTMORE HOMES, LLC                :
-------------------------------------------------------X
```

<u>MEMORANDUM OF DECISION</u>

On March 7, 2005, plaintiff Stiles Machinery, Inc. ["plaintiff" or "Stiles"] commenced this diversity action against defendants LesCare Kitchens, Inc. ["LesCare Kitchens" or "LesCare"] and Jay Lestorti, a/k/a James Lestorti ["Lestorti"]. (Dkt. #1). In its Complaint, Stiles alleges a breach of a promissory note ["the Note"] executed by defendant LesCare Kitchens and breach of a personal guaranty ["the Guaranty"] executed by defendant Lestorti. (Id.). On April 12, 2005, Stiles dismissed its claim against defendant LesCare Kitchens, without prejudice and without costs to either party. (Dkt. #13).

On March 7, 2005, Stiles filed an Application for Prejudgment Remedy ["PJR"] and Motion to Disclose Property and Assets. (Dkts. ##6-7). Twenty-two days later, United States District Judge Janet Bond Arterton referred these motions to this Magistrate Judge. (Dkt. #9). On May 20, 2005, a hearing was held (Dkts. ##19-21; see Dkt. #76), and on May 31, 2005, this Magistrate Judge granted plaintiff's Application for Prejudgment Remedy and Motion to Disclose Property and Assets in the amount of $420,000. (Dkt. #24).

On November 16, 2005, plaintiff filed its Motion for Joinder of Party Defendant and for Leave to Amend the Complaint (Dkts. ##32-33), which Judge Arterton granted on December 21, 2005, absent objection. (Dkt. #35). Thereafter, on January 9, 2006, plaintiff

filed an Amended Complaint, in which it joined Builtmore Homes, LLC ["Builtmore Homes"] as a party defendant.[1]  (Dkt. #36).[2]  On September 12, 2006, defendant Lestorti filed his Answer to the Amended Complaint (Dkt. #57), and the next day, defendant Builtmore Homes filed its Answer.  (Dkt. #61).

On September 15, 2006, the parties consented to trial before this Magistrate Judge. (Dkt. #63). A bench trial was held on January 16, 17 and 18, 2007, at which the following individuals testified: David Rothwell, the Executive Vice President of Stiles; Heinz Schmidt, of Schmidt Industries, LLC, who serves as a sales agent for Stiles; Andres Muehlbauer, Stiles' Chief Financial Officer;[3] Paul Bernick, LesCare Kitchens' former Corporate Comptroller; Kristi Forgione-Nocera, Lestorti's former administrative assistant; James Lestorti, the defendant in this case and the former Co-President of LesCare Kitchens; and Attorney Charles Oman, III. (Dkts. ##69-75; see also Dkts. ##77-79).  At the conclusion of evidence, this Court granted defendant Builtmore Homes' Motion for Judgment and dismissed Count Three of plaintiff's Amended Complaint, based on plaintiff's failure to present clear and convincing evidence to support its claim for constructive fraudulent transfer pursuant to CONN. GEN. STAT. § 52-552f.[4]

---

[1]In its Amended Complaint, plaintiff asserted the following: liability as to defendant Lestorti pursuant to the Guaranty (Count One); actual fraudulent transfer as to Lestorti and Builtmore Homes (Count Two); and constructive fraudulent transfer as to Lestorti and Builtmore Homes (Count Three).  (Dkt. #36).

[2]On June 27, 2006, defendant Builtmore Homes filed a Motion for Dissolution of Attachment Order (Dkt. #47), which motion was granted to the extent agreed upon by counsel as stated in the Order on Motion for Dissolution of Attachment and Substitution of Collateral for Lien, entered June 30, 2005.  (Dkts. ##50-51; see also Dkts. ##48-49, 52).

[3]Rothwell testified that Muehlbauer is the treasurer of Stiles.  (Dkt. #77, at 6; but see Dkt. #78, at 3).

[4]See note1 supra.  Defense counsel had moved for judgment as a matter of law with respect to Counts Two and Three (Dkt. #79, at 244-46), which this Court granted with respect to Count Three and denied with respect to Count Two.  (Id. at 246-47).

(Dkt. #79, at 246-47).

On May 2, 2007, defendants filed their post-trial brief (Dkt. #81; see Dkt. #80), plaintiff filed its Proposed Findings of Fact and Conclusions of Law (Dkt. #83; see Dkt. #80), and defendant Lestorti filed his Memorandum in Support of Oral Motion to Strike Undisclosed Testimony of Gus Lesnevich. (Dkt. #82).[5] Twenty days later, plaintiff filed its brief in opposition to Lestorti's Motion to Strike (Dkt. #84) and its rebuttal to defendants' post-trial brief. (Dkt. #85). On that same day, defendants filed their Proposed Findings of Fact and Conclusions of Law. (Dkt. #86).

For the reasons set forth below, judgment shall enter in favor of plaintiff and against defendant Lestorti on Count One in the amount of $533,721.58, and judgment shall enter in favor of defendant Builtmore Homes, LLC on Count Two.

## I. FACTUAL FINDINGS

The following constitutes this Court's findings of fact pursuant to FED. R. CIV. P. 52(a):

### A. THE PARTIES

Stiles is in the business of selling and distributing woodworking equipment and engineering services, including panel processing equipment used for surface edging on kitchen cabinets. (Dkt. #77, at 3-4). Stiles' headquarters is in Grand Rapids, Michigan and the business operates in five other locations. (Dkt. #77, at 4). LesCare Kitchens was, inter alia, in the business of cabinet making, and in 2004, James Lestorti was the company's Co-

---

[5]On January 17, 2007, at the conclusion of the testimony of plaintiff's handwriting expert, Gus Lesnevich, defendants made an oral motion to strike Lesnevich's testimony. (Dkt. #78, at 188-90; see note 20 infra). This Court overruled the objection without prejudice to reconsideration once the Court had the opportunity to read the expert report in detail. (Dkt. #78, at 191-92; see Exh. G).

President and Secretary.[6]  (Dkt. #79, at 41-42; <u>see</u> Dkt. #77, at 5).  LesCare Kitchens operated primarily out of its facility in Southington, Connecticut, but had facilities in Waterbury, Connecticut and, from 2002 through 2004, in Statesville, North Carolina.  (Dkt. #77, at 5-6, 11; Dkt. #78, at 79; Dkt. #79, at 44-46).

Builtmore Homes, LLC is a Connecticut limited liability company established in the Spring of 2005 to "build custom estate homes throughout the foothills of the Berkshires." (Dkt. #79, at 89, 90-91).   Builtmore Home's sole asset is Lestorti's property at 48 Northington Drive, Avon, Connecticut.  (Dkt. #79, at 207-08).

<u>B. THE PARTIES' BUSINESS RELATIONSHIP</u>

Stiles and LesCare Kitchens maintained a business relationship from 1998 until 2004, when LesCare Kitchens went out of business. (Dkt. #77, at 5-6, 10; Dkt. #79, at 46-47). During the course of Stiles and LesCare Kitchens' relationship, Heinz Schmidt served as the sales agent for Stiles through Schmidt Industrial Services, Inc.[7]  (Dkt. #77, at 7-8, 172-73, 180-81).   Schmidt was extensively involved in selling to LesCare Kitchens the Stiles' machinery necessary to properly expand LesCare's business in its Statesville, North Carolina facility.  (Dkt. #77, at 183-90).

In late 2002, LesCare Kitchens purchased a homag edge-banding machine from Stiles through Schmidt for LesCare's Statesville's facility, which machine was delivered on or about December 12, 2002.  (Dkt. #77, at 13, 192; Exhs. 1-2).   Under its sales agreement with LesCare Kitchens, Stiles was responsible for unloading and installing the machine.  (Dkt. #77,

---

[6]LesCare Kitchens is owned by a trust, the Lestorti Brothers Irrevocable Trust, created by Lestorti's father and controlled by two trustees, Coleman B. Levy and Ralph J. DeLeo.  (Dkt. #79, at 41, 43).

[7]Currently, Schmidt runs Schmidt Industries, LLC.  (Dkt. #77, at 172).

at 14, 150).  When the homag edge-banding machine (which is about six feet tall, six feet wide and approximately thirty feet long) was unloaded from Stiles' delivery truck, the machine fell off the truck and sustained damage.  (Dkt. #77, at 13-14, 192; Dkt. #79, at 134-36).  According to Rothwell and Schmidt, the damage was "cosmetic"; Lestorti, however claimed that the machine was "smashed" and would have to be replaced.  (Dkt. #77, at 14-15, 109, 192-96; Dkt. #79, at 53).  Stiles agreed to replace the machine, as any damage was Stiles' "responsibility"[8] (Dkt. #77, at 87; <u>see</u> Dkt. #79, at 54, 137-38), but the replacement would take about three or four months to be delivered to LesCare, so in the interim, Stiles repaired the machine and sent LesCare Kitchens a second homag edge-banding machine. (Dkt. #77, at 19-21, 196-200; Dkt. #79, at 138-44, 146-48; Exh. 9).

Stiles offered LesCare Kitchens a $52,000 discount on the second edge-banding machine if LesCare purchased both machines.  (<u>See</u> Dkt. #77, at 23, 88, 156, 170-71, 205-07).  Schmidt testified that LesCare Kitchens had expressed an interest in purchasing more than one homag edge-banding machine in order to facilitate one hundred percent capacity usage at the Statesville location; according to Schmidt, a layout with two homag edge-banding machines was the initial first phase of their expansion plan, with four machines for capacity usage.  (Dkt. #77, at 203-06).  However, at that time, LesCare Kitchens did not agree to buy a second machine. (Dkt. #77, at 207).

On November 1, 2003, Stiles sent LesCare Kitchens an invoice for the second edge-banding machine (Exh. 9), with the intent of "push[ing LesCare] to make up [its] mind whether" it was going to buy two machines.  (Dkt. #77, at 26-28, 96-97).  The invoice included payment terms, although all parties agree that there was no signed sales agreement

---

[8]According to Schmidt, it is "almost an industry standard" that it is the "customer" who is responsible for unloading and installing machinery.  (Dkt. #77, at 188).

for the second machine. (Dkt. #77, at 26-28, 89-90, 96-97; Exh. 9; Exh. A). After the April 24, 2004 payment due date passed, Rothwell sent LesCare Kitchens a letter in which he confirmed, for insurance purposes, that the second machine had been and continued to be owned by Stiles while the details of financing were being worked out. (Dkt. #77, at 28-29, 125; Exhs. 4-5). This letter was dated May 6, 2004, to the attention of "Jay Lestorti,"[9] with a countersignature for "Jay Lestorti," dated May 7, 2004 ["May Letter Agreement"]. (Exhs. 4-5). Lestorti testified that he never saw this letter. (Dkt. #79, at 150).[10] In response to his letter, Rothwell received correspondence by facsimile machine from Kristi Forgione-Nocera with LesCare's logo, address and fax number, dated May 6, 2004, but fax stamped May 7, 2004, on which the following is written, "Good Morning, Jay asked me to forward this to you[.] [I]f there are any questions please give Jay a call. . . ." (Dkt. #77, at 30-33; Exh. 5). According to Lestorti, he was "absolutely not" in Connecticut to sign this document and the "Jay" referred to in the fax cover sheet could have been someone else named Jay at LesCare. (Dkt. #79, at 212-13).[11] The letter attached to the fax has a signature above the signature line bearing the name, "Jay Lestorti"; the first two letters of the signature are "JC." (Exh. 5). Forgione-Nocera testified that she did not write that signature above the signature line,

---

[9]Lestorti's nickname since childhood is "Jay." (Dkt. #79, at 62-63). Lestorti testified that he does not use his nickname for legal documents. (Id. at 107). See note 20 infra.

[10]When first asked where he was in the beginning of May 2004, Lestorti testified that he was in "North Carolina – Statesville, North Carolina." (Dkt. #79, at 63). Then Lestorti testified in detail regarding his whereabouts for May 7-9, 2004, including a trip to York, Pennsylvania, Islip, Long Island and then various locations in New Hampshire, with the last destination part of a Mother's Day tradition of attending a NASCAR race. (Dkt. #79, at 63-67; see Section II.A. infra.).

[11]Lestorti testified that he was "sure out of the 600 and some-odd people [working for LesCare], there [were] a couple of Jay's hanging around there"; he "believe[d]" he knew someone else called Jay at LesCare though he "[could not] think of their last names right now." (Dkt. #79, at 213).

nor did she recognize the signature as being that of Lestorti. (Dkt. #79, at 25-26).[12]

Attorney Charles Oman, III testified as a rebuttal witness to Lestorti's testimony that Lestorti was "absolutely not" in Waterbury, Connecticut on May 5, 2004, two days before the May Letter Agreement was signed; Lestorti also denied that Attorney Oman acknowledged his signature for a Power of Attorney and that Attorney Oman took Lestorti's deposition on May 5, 2004, both of which occurred in Waterbury, Connecticut. (Dkt. #79, at 63-67, 79-80; see id. at 213-16). To the contrary, Attorney Oman testified that while he does not "specifically recall" seeing Lestorti sign the Power of Attorney form, Attorney Oman never has acknowledged anyone's signature without the person being present, and Lestorti clearly was in attendance on May 5 when Oman took his deposition in Waterbury, Connecticut shortly after Lestorti signed the Power of Attorney. (Dkt. #79, at 229-39; Exhs. 30, 48-49).

Two months prior to the issuance of the May Letter Agreement, Stiles assisted LesCare Kitchens in trying to secure financing for the two machines through Stiles Leasing. (See Exh. 3; Dkt. #77, at 24-26, 90-94; Dkt. #78, at 4-10; Exh. A).[13] However, such financing was never secured, and on June 10, 2004, Stiles removed the second machine from LesCare Kitchen's North Carolina facility. (Dkt. #77, at 26, 43, 49, 114; Dkt. #79, at 151-52,

---

[12]Forgione-Nocera testified that at times, she would sign Lestorti's name for him, but only with authorization. (Dkt. #79, at 23-24; see Exhs. 42 & H; see Section I.C. infra.). Forgione-Nocera signed Lestorti's name at her deposition using his initials "JC," and in Court, signed Lestorti's name "James C." (Dkt. #79, at 31-32, 35; Exhs. 42 & H). Additionally, Forgione-Nocera testified that "[m]ost of the time, I signed it James C. Lestorti." (Dkt. #79, at 37-39). Forgione-Nocera left on maternity leave in June 2004, and was laid off in December 2004, when she was scheduled to return. (Id. at 32).

[13]Previously, Stiles had received a letter of credit from LesCare Kitchens as security for sale of Cefla products when Stiles knew that Wachovia Bank had a standby letter of credit for most of the financing of the Statesville plant. (Dkt. #78, at 49-50; see Dkt. #79, at 58-59).

216).[14]  Stiles issued LesCare Kitchens a credit for this machine on June 21, 2004.  (Exhs. 6-7; Dkt. #77, at 45, 98).  However, at this time, LesCare Kitchens still was carrying an outstanding debt to Stiles.  (Dkt. #77, at 48-50, 54-55; see Dkt. #78, at 18-31, 37, 86, 96-101; Dkt. #79, at 158; Exhs. 6, 8, 20-21).[15]

### C. PROMISSORY NOTE & GUARANTY

Lestorti testified that by May 2004, the financial condition of LesCare Kitchens was a "going concern," and the company was having "minor cash flow problems."  (Dkt. #79, at 60-61; see also Dkt. #77, at 125-26).[16]  Thereafter, on August 23, 2004, Rothwell and Schmidt traveled to LesCare Kitchens' North Carolina facility for a meeting with Lestorti.  (Dkt. #77, at 55-56, 212-13, 217; see Dkt. #79, at 69, 158-59; Exh. 8).  Rothwell and Schmidt observed that although the facility was not shut down, there were "only a few people . . . in the plant, and the machines were not running."  (Dkt. #77, at 56, 99-100, 218).  However, according to Rothwell, either Lestorti or Longino asked Rothwell "for a good finishing man" and a supervisor because "[Lestorti] was going to get the level of production cranked back up."  (Dkt. #77, at 56, 168-69).  Rothwell testified that he wanted a personal guarantee from Lestorti so that Stiles would be in a "better position" to collect the debt owed

---

[14]Lestorti mistakenly believed that this removal occurred in August, not June or July.  (Dkt. #79, at 151-52).

[15]Rothwell testified that Stiles never initiated suit over this debt because LesCare Kitchens was a long-standing customer and Rothwell felt his company would "eventually" get paid.  (Dkt. #77, at 164; see also Dkt. #77, at 100-01, 115-16, 165-66).

Lestorti denied that he knew LesCare Kitchens owed Stiles more than $400,000 during the Summer of 2004 (Dkt. #79, at 159), but on cross-examination, after testifying that he "always tell[s] the truth" (id. at 160), his counsel stipulated that Lestorti testified at his deposition that he knew that Lescare Kitchens owed "$412,000" to Stiles.  (Id. at 161).

[16]Lestorti testified that between May and November 2004, he personally advanced $3.3 million dollars of his own money to LesCare Kitchens, its trustees, and/or its suppliers, including $2.5. million in cash "through the trustee."  (Dkt. #79, at 67-69).

since Rothwell was not confident that LesCare Kitchens would be able to pay. (Dkt. #77, at 57, 132-34, 136). Rothwell and Schmidt testified that Lestorti agreed to Rothwell's proposal for the promissory note and the personal guarantee and that the parties worked out payments that Lestorti could "afford." (Dkt. #77, at 57-59, 220). Lestorti claims that he received the draft of the Note and Guaranty prior to this meeting and while he agreed that Rothwell asked him to sign a promissory note, Lestorti testified that he told Stiles that he "would not sign the guarantee," and that he "[does not] do personal guarantees. . . ." (Dkt. #79, at 162-69; see also id. at 219).[17]

Nine days after Rothwell's meeting with Lestorti at the Statesville facility, Rothwell wrote Lestorti confirming, inter alia, the parties' discussion regarding the "personal guarantee" for the amounts "due [to] Stiles and its affiliates," including Schmidt Industrial Services. (Dkt. #77, at 60-63, 221-24; Exh. 10). Attached to Rothwell's September 1, 2004 letter was a blank draft of a Promissory Note in the amount of $412,929.25 and a Guaranty, a list of the outstanding balances due to Stiles from LesCare Kitchens, and copies of invoices from Cefla Finishing that Lestorti requested. (Exh. 10; see also Dkt. #77, at 57-58, 61-63). Lestorti testified that he received this letter that looked like "some prior notification" he had gotten before the August 23, 2004 meeting, but he placed it on the side of his desk. (Dkt. #79, at 168-69).

Rothwell testified that sometime thereafter, he instructed Kevin Dougherty, Stiles' outside counsel, to send Lestorti a collection letter, referencing the unpaid debt and threatening to initiate suit. (Dkt. #77, at 67, 69-70). According to Lestorti, by Fall 2004, LesCare Kitchens had "a cash flow problem," and he knew that Stiles still maintained that

---

[17]In Lestorti's words, he responded, "[N]o way, José." (Dkt. #79, at 163). See also note 21 infra.

LesCare Kitchens owed the company money. (Dkt. #79, at 186-87). However, Lestorti claims that he never saw any demand letter from Stiles' counsel. (Dkt. #79, at 187-88).

As a result, Rothwell agreed to adjust the payment terms from four equal installments to lesser payments over a longer time; Stiles' in-house counsel Michael Callahan drafted a new note and "[s]hortly thereafter," Rothwell received the executed Promissory Note and Guaranty that had been faxed to Schmidt.[18] (Dkt. #77, at 43, 72-80, 246-55; see id. at 120-24; Exhs. 12-13). Bernick testified that he and Lestorti "had a discussion about the requirement to sign [the Note]" in order for LesCare Kitchens "to continue using the equipment" (Dkt. #78, at 105-06), and that Tim Longino, Lescare's Managing Director, instructed Bernick to sign the Note on behalf LesCare Kitchens.[19] (Id. at 77-78, 104-07).

_____

[18]Bernick, LesCare's former Corporate Comptroller, and Forgione-Nocera, Lestorti's former administrative assistant, both testified that there were rubber stamps at LesCare Kitchens bearing James C. Lestorti's signature, which rubber stamps could be used with Lestorti's authorization. (Dkt. #78, at 70, 81-85; Dkt. #79, at 20-23; see Exh. 44). Bernick used this rubber stamp on a weekly basis between March 2004 and the end of 2004. (Dkt. #78, at 70, 83). Additionally, Bernick testified at the May 20, 2005 PJR hearing that he would not have signed the promissory note "without prior authorization." (Dkt. #76, at 18).

Lestorti's signature was also in computer-generated form. (See Dkt. #79, at 178, 183-84; Exh. 45). Additionally, as stated above, Forgione-Nocera testified that at times, she would sign Lestorti's name for him, but only with authorization. (Dkt. #79, at 23-24; see Exhs. 42 & H). This signature would include either his initials or his full name, but "[m]ost of the time, I signed it James C. Lestorti." (Dkt. #79, at 37-39).

In contrast, Lestorti testified that he "[n]ever, ever" authorized any "human being to sign [his] name," and he had not authorized Bernick to sign on behalf of the company. (Dkt. #79, at 73).

[19]While Bernick could no longer recall many of the details of the circumstances that gave rise to this cause of action, Bernick's testimony with respect to his authority to sign the Note is consistent with his testimony at the May 20th PJR hearing and with the testimony of Schmidt. Bernick testified at the trial that he was told by Lestorti that the hierarchy in LesCare Kitchens included Lestorti as a Co-President and Longino as a Managing Director to whom Bernick reported. (Dkt. #78, at 77-78). Longino reported to Lestorti. (Id. at 79). Based on his familiarity with the hierarchy of LesCare Kitchens from his fourteen years of business with the organization, Schmidt testified that Tim Longino was the "second in command" to Lestorti and it was Longino with whom Schmidt spoke about the Note in the months following the August meeting in Statesville. (Dkt. #77, at 247-48).

Lestorti adamantly denies that it is his signature on the Guaranty (Dkt. #79, at 40, 74, 106-07, 112),[20] and in fact, testified that when he first saw this Guaranty in connection with this

_____

[20]As discussed in more detail below, plaintiff's handwriting expert, Gus Lesnevich, compiled twenty-five handwriting exemplars of Lestorti for his own review. (See Exhs. 37, 40 & G). While on the witness stand, Lestorti reviewed several of these handwriting exemplars, in addition to some exhibits in this trial, to determine whether these documents contained his true signature.

According to Lestorti, a substantial number of purported signatures were not his, e.g., thirteen out of the twenty signatures referred below, including his purported signature on several legal documents. Specifically, according to Lestorti, it is his signature on the verification page of Defendants' Answer to Plaintiff's Interrogatories and Request for Production, acknowledged by his attorney here (Exh. 43; Dkt. #79, at 84-85); "perhaps" he signed a letter from Stiles, dated August 15, 2002, although he "really do[es]n't know" (Exh. 19; Dkt. #79, at 117-18); he "believes" it is his signature on the Lescare Kitchens Certification and Corporate Vote, dated January 18, 2005 (Exh. 37; Dkt. #79, at 120); he testified that he did sign the Written Consent in Lieu of Special Meeting of the Board of Directors of Les-Care Kitchens, Inc., dated December 6, 1983, as well as the following filing, dated July 15, 1986 (Exh. 37; Dkt. #79, at 121-22); and Lestorti testified that it is his signature on the Quit-Claim Deed, dated June 19, 2005 (Exh. 37, Dkt. #79, at 124-25).

In contrast, he testified that it is not his signature on the Guaranty Agreement, dated September 17, 2002, though "[he] know[s] who did [sign this]" (Exh. 37; Dkt. #79, at 118-19); it is not his signature on the next pages that follow the Guaranty Agreement in Exh. 37, i.e., Consent in Lieu of Special Meeting of the Board of Directors, dated December 15, 1998 (id. at 119-20); he "definitely" did not sign the two cancelled stock certificates, although he "know[s] who did" (id. at 120-121); he did not sign two pages, dated November 26, 1986, nor did he sign the Written Consent in Lieu of Special Meeting of the Board of Directors of Les-Care Kitchens, Inc., dated December 9, 1989 (id. at 122-23); he does not "believe" that it is his signature on the following page, Written Consent in Lieu of Special Meeting of the Board of Directors, dated January 3, 1990, and he testified that it is "doubtful" that it is his signature on the Written Consent in Lieu of Special Meetings of the Board of Directors of Les-Care Kitchens, Inc., dated December 7, 1990 (id. at 123); the signature on the next page, dated January 4, 1995 is "definitely not" his, nor is the signature on the following pages, dated January 20, 1997 and January 19, 1998 (id. at 123-24); and he does not think that he signed the form, dated March 11, 2004. (Id. at 125).

Further, Lestorti testified that he "would never sign a legal document or any document with a nickname of Jay C. Lestorti." (Dkt. #79, at 107). He never revealed the name of the individual or individuals whom he believed had forged his signature.

Plaintiff's handwriting expert, Gus Lesnevich (see Exh. 36), testified that he examined the copies of signatures in Exh. 37, and in comparing the signatures (see Exh. 40), he could not draw a "definitive conclusion" that one person was the author of all of these signatures, and that he could neither identify nor eliminate Lestorti as the author of all of the signatures. (Dkt. #78, at 170-74, 184-85; see also Exh. G, at 2-3). Lesnevich also testified, however, that it is "more likely than not" that the signature on the Guaranty at issue was written by the same person who wrote the other signatures. (Dkt. #78, at 173-74).

At the trial, defendant Lestorti made an oral Motion to Strike Lesnevich's testimony on grounds that his opinion is "not helpful to the Court," and that the opinion is "a new opinion," not

litigation, he believed it was a "forgery" as he had been a victim of forgery before.[21] Stiles did not receive any payments on the Note. (Dkt. #77, at 80-82).

### D. CONVEYANCE TO BUILTMORE HOMES, LLC

In January 2005, LesCare Kitchens became the subject of an involuntary bankruptcy petition and ultimately LesCare was placed in an involuntary Chapter 7 bankruptcy. (Dkt. #79, at 87-88). On April 28, 2005, Stiles filed a Proof of Claim in LesCare Kitchens' bankruptcy action, for a total of $347,624.82, secured by "[v]arious machinery." (Dkt. #78, at 57-59; Exh. B).[22] As previously indicated, on May 31, 2005, this Court granted plaintiff's

---

previously disclosed in his expert report. (Dkt. #78, at 188-91). This Court overruled the objection without prejudice to reconsideration once the Court had the opportunity to read the expert report in detail. (Id. at 191-92; see Exh. G). On May 2, 2007, defendant Lestorti filed a brief in support of his oral Motion to Strike Undisclosed Testimony of Gus Lesnevich (Dkt. #82), in which he asserts that because Lesnevich's trial testimony was never disclosed before trial as required by FED. R. CIV. P. 26(a)(2)(B), it should be excluded pursuant to FED. R. CIV. P. 37(c)(1). Specifically, defendant Lestorti contends that the four factors outlined by the Second Circuit that are used to determine whether evidence should be excluded pursuant to Rule 37(c)(1) weigh in favor of exclusion as: (1) plaintiff offered no explanation for its failure to disclose Lesnevich's testimony; (2) the importance of Lesnevich's testimony mandates its prior disclosure; (3) permitting Lesnevich's testimony would substantially prejudice defendant; and (4) because the trial has already been completed, a continuance for new discovery is not possible. (Dkt. #82, at 7-13; see Design Strategy, Inc. v. Davis, 469 F.3d 284, 296 (2d Cir. 2006)(citations omitted)).

On May 22, 2007, plaintiff filed its brief in opposition to Lestorti's Motion to Strike (Dkt. #84), in which it contends that Lesnevich's testimony was within the scope of his expert report, and the exclusion of Lesnevich's testimony under Rule 37(c)(1) is not warranted in this case (at 3-11).

Lesnevich's conclusion is not determinative to this Court's conclusion for the reasons stated in Section II. infra. Accordingly, defendant's Motion to Strike is denied as moot.

[21]Lestorti's testified that he "got burnt once years ago . . . in another business venture" when "a manager signed a personal guarantee in my name[;]. . . [i]t was a forged document." (Dkt. #79, at 71-72). Lestorti testified that this happened in 1984 and he has "never signed another personal guarantee in [his] life again." (Id. at 72). At the May 20, 2005 PJR hearing, Lestorti testified "that as long as [I have] been in business, for [twenty-seven] years, I have never signed a personal guarantee." (Dkt. #76, at 67).

Despite testifying the signature in this case is a forgery, Lestorti never contacted any law enforcement officials. (See Dkt. #79, at 112-16).

[22]See also Exh. 20 (total amount outstanding is $347,624.82).

Application for Prejudgment Remedy in the amount of $420,000. (See Dkt. #24). On that same day, this Court also granted plaintiff's Motion to Disclose Assets, and ordered defendant to disclose assets on or before June 17, 2005, which he did not do until January 9, 2006. (See id. & Exh. 41).

On June 17, 2005, plaintiff's counsel filed a Certificate of Attachment of Real Estate in the amount of $420,000, for the 48 Northington Drive property, entitled on the map on file in the Avon Town Clerk's Office as "Plan of Resubdivision 'Garnett Hill Phase-2' . . . Northington Drive & Garnet Hill Lane Avon, Connecticut . . . ." (Exh. 34)(emphasis omitted). Two days later, Lestorti quit-claimed his home at 48 Northington Dr. to Builtmore Homes, LLC, a company owned by Lestorti, so that his house could be used as a model home. (Dkt. #79, at 93; Exh. 33). Accordingly, the title of the residence is in Builtmore Homes' name but Lestorti holds the mortgage. (Dkt. #79, at 97, 99). This property is subject to the $420,000 attachment from Stiles (see Dkt. #24; Exh. 34; Exh. 41, at n.1), a $330,000 mechanic's lien (Exh. 41, at n.1; Dkt. #79, at 98), and a lis pendens. (Dkt. #79, at 104).

## II. DISCUSSION

The following constitutes this Court's conclusions of law, pursuant to FED. R. CIV. P. 52(a).

According to defendants, the evidence does not support plaintiff's claim for damages resulting from the breach of the purported personal guaranty because the two documents purportedly bearing defendant Lestorti's signature were admitted in full, except with respect to the authenticity of the signature (Dkt. #81, at 2-3); plaintiff failed to satisfy its burden of proof that Lestorti executed the Guaranty as no witness testified that it was Lestorti's signature and Forgione-Nocera, a lay witness, competently testified that it was not Lestorti's signature (Dkt. #81, at 4-6; see Dkt. #86, at 10-12); plaintiff failed to prove that any person

had authority to sign Lestorti's name to the Guaranty (Dkt. #86, at 12); even if plaintiff were able to satisfy its burden of proving the validity of the signatures on the Note and Guaranty, there was no consideration for the instrument (id. at 13); and defendant Lestorti would not have executed a personal guarantee for any debt as he was a large creditor of the company and he testified to his long-standing policy of not executing personal guarantees (Dkt. #81, at 7-8).

According to plaintiff, the evidence adduced at trial established that defendant Lestorti executed the Guaranty (Dkt. #85, at 2-4), and during trial this Court denied Lestorti's Rule 52 motion regarding the acceptance of the Guaranty as evidence (id. at 2-4); Lestorti's testimony concerning the authenticity of his signature on many of the documents in evidence is incredible and Lestorti did not credibly testify about whether he ever gave other people the authority to sign his name or about a stamp with a facsimile of his signature that was used to sign corporate checks, personal checks and other documents (Dkt. #83, at 11-14; Dkt. #85, at 4-6); Lestorti testified inconsistently and incredibly with respect to other circumstantial evidence relating to the Note and Guaranty and his testimony was evasive (Dkt. #83, at 15-16); Lestorti did not accurately list his assets on his sworn disclosure of assets (id. at 17-18); and circumstantial evidence supports the authenticity of the Guaranty, including Lestorti's motive to execute the Guaranty. (Dkt. #83, at 19-21; Dkt. #85, at 7-8).

A. COUNT ONE: BREACH OF GUARANTY

1. AUTHENTICITY OF THE SIGNATURE

At the close of plaintiff's evidence, defendants moved for judgment under Rule 52 of the Federal Rules of Civil Procedure on grounds that the Guaranty at issue "has not been accepted into evidence," and plaintiff failed to satisfy its burden to prove authenticity under Conn. Gen. Stat. § 42a-3-308(a). (Dkt. #78, at 195-96; see id. at 200-04, 209-10). In

14

response, plaintiff urged that the under "[CONN. GEN. STAT. § 42a-3-308(a)] the validity of the signature can be proved by direct or circumstantial evidence . . . [and] the evidence in this case is . . . replete with regard to circumstantial evidence." (Id. at 196-200; see id. at 204-07, 210-12). The Court "denied [defendants' motion] for the reasons stated by plaintiff's counsel," observing:

> [T]he plaintiff's case with respect to apparent authority, . . .
> is certainly stronger than it is with respect to actual authority. . . .
>
> . . .
>
> [Defense counsel is] right [that plaintiff bears the burden of
> establishing actual authority] and that will be the question that [the Court]
> will have to parse through the exhibits to try to figure out, if it happened at
> all, but certainly there is enough evidence for the case to go forward, and
> [the Court is] certainly not saying the plaintiff [is] going to prevail at the end
> of trial, but there's certainly enough to continue on.

(Dkt. #78, at 212, 214). Plaintiff did not offer evidence in support of a claim of actual or apparent authority for the signature on the Guaranty, but at the close of the trial, plaintiff offered a rebuttal witness, Attorney Charles Oman, III, who, as further discussed above and below, testified credibly that he witnessed defendant Lestorti's signature on May 5, 2004 in Waterbury, Connecticut. (Dkt. #79, at 229-30; Exh. 30). Because this authenticated signature may be used to compare the signatures on the May Letter Agreement and the Guaranty, see United States v. Saadey, 393 F.3d 669, 679 (6th Cir. 2005)(where one document has been properly authenticated, the trier of fact could compare the signature on that document with the signature of another); 28 U.S.C. § 1731 ("The admitted or proved handwriting of any person shall be admissible, for purposes of comparison, to determine the genuineness of other handwriting attributed to such person."), the issue of authority to sign

the Guaranty on Lestorti's behalf has now become inapposite.[23]

Rule 901(a) of the Federal Rules of Evidence provides: "The requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims."[24]  "Rule 901 does not erect a particularly high hurdle, and that hurdle may be cleared by circumstantial evidence."  <u>United States v. Tin Yat Chin</u>, 371 F.3d 31, 37 (2d Cir. 2004)(citation & internal quotations omitted).  The persuasive force of the signature above Lestorti's name is a decision that lies with the trier of fact.  <u>See id.</u> at 38.  Under Rule 901, the trier of fact may authenticate the handwriting by comparing the specimens of his writing

---

[23]"In the absence of extreme or unusual circumstances . . . , [there is] no reason why handwriting comparisons cannot be made by [the trier of fact], and conclusions drawn from them, either in the presence or absence of expert opinion."  <u>United States v. Woodson</u>, 526 F.2d 550, 551 (9th Cir. 1975)(<u>per curiam</u>)(citations omitted); <u>see also Brandon v. Collins</u>, 267 F.2d 731, 733 (2d Cir. 1959)(<u>per curiam</u>)("The admitted or proved handwriting of any person shall be admissible, for purposes of comparison, to determine genuineness of other handwriting attributed to such person.")(internal quotations & footnote omitted); 28 U.S.C. § 1731.

  "'[E]xtreme or unusual circumstances' involve situations where the authenticity of the handwriting is the primary issue in the case, as where forgery is alleged."  <u>United States v. Jenkins</u>, 785 F.2d 1387, 1395 (9th Cir.), <u>cert. denied sub nom. Prock v. United States</u>, 479 U.S. 855 & <u>White v. United States</u>, 855 U.S. 889 (1986).

  Although this is a case where forgery is alleged, albeit never pursued by Lestorti through the criminal justice system, <u>see</u> note 21 <u>supra</u>, as explained in detail in this Section and Section II.A.2 <u>infra</u>, it was not until the rebuttal testimony of Attorney Oman on the final day of trial that it became clear that Lestorti signed the Power of Attorney on May 5, 2004 in Waterbury, Connecticut and also signed the May Letter Agreement two days later in Waterbury, Connecticut, despite his protestations that he was elsewhere that week.  As a result, Lestorti's allegations of multiple forgeries, <u>see</u> note 20 <u>supra</u>, bear little, if no, weight, so that the Court may rely upon the holdings in <u>Saadey</u>, 393 F.3d at 679, <u>Woodson</u>, 526 F.2d 551, <u>Brandon</u>, 267 F.2d at 733, and the other cases cited below, namely that the trier of fact may make comparisons between handwriting exemplars, either in the presence or absence of expert opinion.

  [24]The satisfaction of authenticity as a "condition precedent to admissibility," <u>see</u> FED. R. CIV. P. 901, "does not mean that the evidence in question is necessarily admissible. . . . Similarly, satisfaction of Rule 901 requirements does not deprive the trier of fact of the power to decide what weight to attribute to the evidence after it has been admitted," or to decide "that the evidence is not authentic and carries no weight whatsoever."  31 Charles A. Wright and Victor J. Gold,  FED. PRAC. & PROC. EVID. § 7103 (2007)(footnotes omitted).

which have been authenticated, FED. R. CIV. P. 901(b)(3), and "Rule 901's requirements are satisfied if sufficient proof has been introduced so that a reasonable [factfinder] could find in favor of authenticity or identification." Tin Yat Chin, 371 F.3d at 38 (citation & internal quotations omitted);[25] see also Greater Kansas City Laborers Pension Fund v. Thummel, 738 F.2d 926, 928 (8th Cir. 1984)["Thummel"]("[G]enerally the trier of fact may compare a contested sample of handwriting with an authenticated sample and decide that the contested sample is authentic even in the absence of expert testimony.")(citations omitted). "[T]he other party then remains free to challenge the reliability of the evidence, to minimize its importance, or to argue alternative interpretations of its meaning, but these and similar other challenges go to the weight of the evidence - not to its admissibility." Tin Yat Chin, 371 F.3d at 38 (citation omitted)(emphasis in original). "[D]oubts about the ultimate reliability of the [evidence], however, [does] not justify [its] exclusion under Rule 901's minimal standards for authentication." Id. at 38.[26]

---

[25]As the Connecticut Appellate Court and Supreme Court have analyzed under Connecticut law:

> Authentication is . . . a necessary preliminary to the introduction of most writings in evidence. . . . In general, a writing may be authenticated by a number of methods, including direct testimony. . . . Both courts and commentators have noted that the showing of authenticity is not on par with the more technical evidentiary rules that govern admissibility . . . . Rather, there need only be a prima facie showing of authenticity to the court . . . . Once a prima facie showing of authorship is made to the court, the evidence, as long as it is otherwise admissible, goes to the [trier of fact], which will ultimately determine its authenticity. . . . The only requirement is that there have been substantial evidence from which the jury could infer that the document was authentic.

State v. Ferraiuolo, 80 Conn. App. 521, 535 (App. Ct. 2003)(internal quotations omitted), certif. denied, 267 Conn. 916 (2004), citing State v. Berger, 249 Conn. 218, 233, 733 A.2d 156 (1999)(additional citations omitted).

[26]As such, it was appropriate for the Court to limit the admissibility of Exhs. 5 and 12 at the time they were introduced, but that conclusion is no longer valid in light of Attorney Oman's rebuttal testimony, as discussed in detail in this Section and Section II.A.2 infra. See Tin Yat Chin, 371 F.3d at 37 (district courts should not "appl[y] an unreasonably high standard for . . .

CONN. GEN. STAT. § 42a-3-308(a) provides:

> In an action with respect to an instrument, the authenticity of, and authority to make, each signature on the instrument is admitted unless specifically denied in the pleadings. If the validity of a signature is denied in the pleadings, the burden of establishing validity is on the person claiming validity, but the signature is presumed to be authentic and authorized unless the action is to enforce the liability of the purported signer and signer is dead or incompetent at the time of trial of the issue of the validity of the signature. . . .

In his Amended Answer, filed on September 12, 2006, Lestorti specifically denied that he executed the Guaranty at issue. (Dkt. #57). Lestorti's "specific denial" then placed the burden of establishing the signature upon plaintiff, "but the signature is presumed to be authentic and authorized . . . until some evidence is introduced which would support a finding that the signature is forged or unauthorized. . . ." CONN. GEN. STAT. § 42a-3-308 cmt.1 (1991). In order for defendant to satisfy his burden, thus shifting the burden to the plaintiff by overcoming the presumption, defendant must make "some sufficient showing of the grounds for denial." Id. If defendant succeeds in satisfying this burden, plaintiff must present evidence establishing the signature by "a preponderance of the total evidence." Id. This burden shifting is appropriate in that "in ordinary experience forged or unauthorized signatures are very uncommon, and normally any evidence [of forgery or lack of authorization] is within the control of, or more accessible to, the defendant." Id.

While defendant Lestorti urges that he satisfied his burden under the statute by denying that he executed the Guaranty and by offering the testimony of his former administrative assistant in support of this denial, thus shifting the burden to plaintiff to establish the signature, this Court finds Lestorti's testimony at trial to be incredible.

During the course of the trial, Lestorti was confronted with many handwriting

authentication under Rule 901.").

exemplars,[27] including a Power of Attorney, dated May 5, 2004 and signed in Waterbury, Connecticut. (See Dkt. #79, at 79-80; Exh. 30). Not only did Lestorti deny that he signed the Power of Attorney document, and the May Letter Agreement, dated two days later on May 7, 2004, Lestorti testified that he was not even in Connecticut during the period of May 5 - May 9, 2004. (Dkt. #79, at 63-67, 80, 216). Lestorti testified that he was in North Carolina on May 5 and 6, 2004 and on May 7, 2004, he embarked on an elaborate trip throughout the East Coast that took him from North Carolina to York, Pennsylvania, then to Islip, Long Island, and finally to Loudon, New Hampshire so that he could attend a NASCAR race that he has attended every year for the past sixteen years on Mother's Day. (Id.). When given the chance to reconsider his testimony, Lestorti quipped, "To the best of my recollection, I was on that trip that I have records to show that, so, you know, I mean, I - - unless I'm Jesus, I could[n't] be [in] three places at once." (Dkt. #79, at 216).[28]

Attorney Oman's credible rebuttal testimony places Lestorti in Waterbury, Connecticut on May 5, 2004, when Attorney Oman acknowledged Lestorti's signature, after which he took Lestorti's deposition. (Dkt. #79, at 232-35, 237-39; Exhs. 30, 48).[29] Further, the May 7, 2004

---

[27]Lestorti's testimony concerning the authenticity of his signatures generally is inconsistent and unreliable. Of the more than twenty-five documents he was confronted with over the course of his testimony, he testified that fifteen documents bore signatures that he did not write, which documents include formal legal documents, and two LesCare corporate documents signed the same day but, according to Lestorti, only one of the two bears his signature. (See note 20 supra; see, e.g., Exhs. 3, 5, 19, 30-33, 37, 41). Defendants offered no evidence as to why so many documents bearing what appeared to be Lestorti's signature had signatures that, according to Lestorti, were not his.

[28]No such records were offered.

[29]According to Lestorti, he was "absolutely not" in Waterbury on May 5, 2004 and Attorney Oman never acknowledged his signature for the Power of Attorney and did not take Lestorti's deposition on May 5, 2004. (Dkt. #79, at 63-67, 79-80; see id. at 213-16).

As previously indicated, while Attorney Oman testified that he does not "specially recall" seeing Lestorti sign the Power of Attorney form, Attorney Oman never has acknowledged anyone's signature without that person being present. (Dkt. #79, at 232-35, 237-39).

fax cover sheet returning the countersigned May Letter Agreement contains a note from Forgione-Nocera stating: "Good morning, Jay asked me to forward this to you. If there are any questions please give Jay a call. . . ." (Dkt. #77, at 30-33; Exh. 5). The date inserted in the countersigned portion of the letter is May 7, 2004, as is the date on the fax stamp. (See Exh. 5)(emphasis added). Additionally, the fax stamp also bears a Connecticut number, "203 574 5908." (Id.). The Court does not credit Lestorti's testimony that he was not in Connecticut to sign this document and that the "Jay" referred to in the fax cover sheet could have been someone else named Jay at LesCare, since "out of the 600 and some-odd people [working for LesCare], there [were] a couple of Jay's hanging around there," although he could not recall the last names of any of them. (Dkt. #79, at 212-13). It is highly unlikely that Lestorti would have a memory lapse as to the surname of another employee named "Jay" who was in a high enough management position to be able to give instructions to Forgione-Nocera regarding important corporate matters, like a corporate promissory note and personal guaranty. Most importantly, Rothwell's fax of May 6, 2004, the day before, was addressed to the attention of "Jay Lestorti" and the blank signature line is for "Jay Lestorti," making it even more unlikely that another Lescare employee named "Jay" responded thereto.

Lestorti's testimony about whether he gave other people the authority to sign his name is equally not credible. According to Lestorti, he "[n]ever, ever" authorized another human being to sign his name, although he did acknowledge that there was a rubber stamp bearing his signature but that the rubber stamp was only in the possession of Forgione-Nocera. (Dkt. #79, at 73, 88, 125). Forgione-Nocera testified that Lestorti authorized her to use a rubber stamp bearing the name of "James C. Lestorti," and Forgione-Nocera would use the stamp on a fax, a letter bearing Lestorti's signature, or on his checkbook to pay his

personal bills.  (Dkt. #79, at 20-22).[30]   Additionally, Bernick testified that as the Corporate Comptroller of LesCare Kitchens, he also had a stamp bearing a facsimile of Lestorti's signature that he "personally" used "[m]oderately," "on a weekly basis," from March to December 2004.  (Dkt. #78, at 81-83).  Bernick would use this rubber stamp after receipt of either a face-to-face or telephonic "verbal authorization" from Lestorti or Tim Longino.  (Id. at 83, 85).  In further contrast to Lestorti's testimony, Forgione-Nocera testified that Lestorti would authorize her to sign Lestorti's name, sometimes adding her initials; as her handwriting exemplars demonstrate, she would sign his name  as "James C. Lestorti," or as "J.C. Lestorti." (Dkt. #79, at 23-24, 31-32, 35-39; Exhs. H & 42).

In addition to the incredibility of Lestorti's testimony, the Court does not find reliable Forgione-Nocera's lay witness testimony[31] with respect to the verification of Lestorti's signature.  Specifically, while Forgione-Nocera testified that she was familiar with Lestorti's signature[32] and that she did not recognize the signature on the Guaranty as his  (Dkt. #79, at 25-27), when plaintiff's counsel attempted to confirm Forgione-Nocera's familiarity with Lestorti's signature by showing her a document about which there is no dispute that Lestorti signed it, Forgione-Nocera again testified that she did not recognize the signature.  (Dkt. #79,

---

[30]Bernick confirmed that Forgione-Nocera had access to a rubber stamp bearing Lestorti's signature, and that Bernick saw her use it when she did Lestorti's personal checking.  (Dkt. #78, at 84-85).  Lestorti testified, however, that he did not authorize Forgione-Nocera to stamp checks for large transactions. (Dkt. #79, at 174-75)("I'm not gonna have some girl in Connecticut stamp it for me. I'm gonna do it myself.").

[31]While lay witness testimony is competent as to the genuineness of handwriting, provided that the familiarity is not acquired for purposes of the litigation, FED. R. CIV. P. 901(b)(2), for the reasons stated below, neither the testimony of Bernick nor the testimony of Forgione-Nocera, with respect to Lestorti's signature, is reliable.

[32]Defense counsel did not inquire into Forgione-Nocera's familiarity with Lestorti's signature other than asking, "Are you familiar with Mr. Lestorti's signature?," to which Forgione-Nocera responded, "I am."  (Dkt. #79, at 25).

at 33-34; see Exh. 3).

Additionally, while Bernick testified at this trial that he did not recognize the writing above the name "Jay Lestorti" on the Guaranty (Dkt. #78, at 120), Bernick's trial testimony was in sharp contrast to his testimony at the PJR hearing before this Magistrate Judge, held on May 20, 2005, just seven months after the events at issue. At the May 20th PJR hearing, Bernick testified that he recalled presenting the Guaranty to Lestorti in the hallway of LesCare Kitchen's Waterbury, Connecticut facility, at which time Lestorti signed the Guaranty. (Dkt. #76, at 6-7, 11-14, 18-19). According to Bernick's testimony on May 20, 2005, it "would be his recollection that [he] did" see Lestorti sign the Guaranty, but his recollection is "vague" and he could "not swear to it." (Dkt. #76, at 13, 18). Moreover, Bernick also testified at that hearing that he then either faxed or mailed the Note to Stiles. (Dkt. #76, at 7).

At this trial, as he did in May 2005, Bernick testified that he and Lestorti "had a discussion about the requirement to sign [the Note]" in order for LesCare Kitchens "to continue using the equipment and satisfy Stiles' concerns over our lack of payment." (Dkt. #78, 105-06). Further, Bernick testified that he was instructed by Lestorti and Longino to sign the Note on behalf of LesCare Kitchens. (Dkt. #78, at 104-07). However, during this trial, Bernick could not recall what he did with the Note after he signed it, and testified that he never saw the executed document until this litigation. (Dkt. #78, at 107-08, 110, 118-19).

Thus, although Lestorti has denied that the Guaranty bears his signature, that signature is presumed to be authentic and authorized as defendants failed to satisfy their burden of introducing credible evidence, including "some sufficient showing of the grounds for denial," "which would support a finding that the signature is forged or unauthorized." CONN. GEN. STAT. § 42a-3-308 cmt.1. Moreover, even assuming arguendo that defendant Lestorti's denial and the testimony of Forgione-Nocera would have satisfied defendants'

22

burden, plaintiff presented Attorney Oman's rebuttal testimony verifying that Lestorti in fact was in Connecticut on May 5, 2004 and signed the Power of Attorney, which was admitted into evidence (see Exh. 30), so that the signature on that May 5th document may be used as a comparison to the signature on the Guaranty. Id. Under FED. R. CIV. P. 901(b)(3), a comparison of Lestorti's signature on the executed Power of Attorney with the May Letter Agreement verifies Lestorti's handwriting, which also draws distinctive similarity to the signature on the Guaranty. (Compare Exhs. 5 & 30 with Exhs. 12 & 30)(identical capital letters, J, C & L);[33] see Saadey, 393 F.3d at 679; Tin Yat Chin, 371 F.3d at 38. This comparison reveals that plaintiff satisfies its burden of establishing Lestorti's signature by "a preponderance of the total evidence." CONN. GEN. STAT. § 42a-3-308 cmt.1.

## 2. CIRCUMSTANTIAL EVIDENCE

The signature on the contract is not the only evidence upon which this Court relies in concluding that Lestorti signed the Guaranty; rather, plaintiff presented substantial circumstantial evidence that tends to support this conclusion. See Thummel, 738 F.2d at 929. On August 23, 2004, Rothwell and Schmidt traveled to LesCare Kitchens' North Carolina facility for a meeting with Lestorti (Dkt. #77, at 55, 212-13, 217; see Dkt. #79, at 69, 158-59; Exh. 8), during which even Lestorti concedes that Rothwell asked Lestorti to sign a promissory note. (Dkt. #79, at 162-64). According to Rothwell and Schmidt, Lestorti agreed to Rothwell's proposal for the Note and Guaranty and agreed that the parties worked out payments that Lestorti could "afford." (Dkt. #77, at 58-59, 220). On September 1, 2004, Rothwell wrote Lestorti confirming, inter alia, the parties' discussion regarding the "personal guarantee" for the amounts "due [to] Stiles and its affiliates." (Dkt. #77, at 60, 221-24; Exh.

---

[33]It also bears resemblance to the signatures to which Lestorti admits. (See note 20 supra).

10; Dkt. #79, at 168).

By Fall 2004, LesCare Kitchens had "a cash flow problem" (Dkt. #79, at 186); Lestorti knew that Stiles still maintained that LesCare owed the company the $412,929.25 debt (Dkt. #79, at 160-61, 187); from May to November 2004, Lestorti personally invested $3.3 million dollars of his own money into LesCare, its trustees, and/or its suppliers, including $2.5 million in cash, "through the trustee" (id. 67-69); and Lestorti was in negotiations to sell the North Carolina facility. (Id. at 186). After Rothwell agreed to adjust the payment terms from four equal installments to lesser payments over a longer time, Stiles' in-house counsel Michael Callahan drafted a new note that was forwarded to LesCare Kitchens. (Dkt. #77, at 72-73, 79-80; see id. at 120-24; see Exhs. 12-13).

Upon receipt of the new Note, Bernick and Lestorti "had a discussion about the requirement to sign [the Note]" in order for LesCare Kitchens "to continue using the equipment." (Dkt. #78, 105-06). Longino, Bernick's superior, instructed Bernick to sign the Note on behalf LesCare Kitchens.[34] (Dkt. #78, at 104-07). In accord with Bernick's testimony at the May 20th PJR hearing, Schmidt testified at this trial that he spoke to Longino regarding the Note and Guaranty, received a fax that included the signed Guaranty; the fax cover sheet bore Longino's name as the sender and represented that the original document would be sent by FedEx; Schmidt received the signed original document the next day by FedEx, and then

_____

[34]While Bernick could no longer recall many of the details of the circumstances that gave rise to this cause of action, Bernick's testimony with respect to his authority to sign the Note is consistent with his testimony at the May 20th PJR hearing and with the testimony of Schmidt. Bernick testified at the trial that he was told by Lestorti that the hierarchy in LesCare Kitchens included Lestorti as a Co-President and Longino as a Managing Director to whom Bernick reported. (Dkt. #78, at 77-78). Longino reported to Lestorti. (Id. at 79). Based on his familiarity with the hierarchy of LesCare Kitchens from his fourteen years of business with the organization, Schmidt testified that Longino was the "second in command" to Lestorti and it was Longino with whom Schmidt spoke about the Note in the months that followed the August meeting in Statesville. (Dkt. #77, at 247-48).

passed it to Rothwell saying, "we have a signature under the promissory note, and we have a signed personal guarantee." (Dkt. #77, at 234-35, 247-55; Exh. 13).

Defendants presented no direct or indirect evidence that anyone else signed the Guaranty (other than Lestorti's denial that he signed this Guaranty or any other guaranty, and Forgione-Nocera's generally unreliable testimony on this issue) to prove that the signature was unauthorized or forged, see CONN. GEN. STAT. § 42a-3-308 cmt.1, nor did they present credible circumstantial evidence countering that Bernick signed the Note at the direction of Longino and Lestorti, and that Lestorti signed the Guaranty that Longino sent to Stiles by fax and FedEx.

### 3. CONSIDERATION

"Consideration consists of a benefit to the party promising, or a loss or detriment to the party to whom the promise is made. . . . Whether an agreement is supported by consideration is a factual inquiry reserved for the trier of fact . . . ." Martin Printing, Inc. v. Sone, 89 Conn. App. 336, 345 (Conn. App. Ct. 2005)(citations & internal quotations omitted). Additionally, "[a] promise to be surety for the performance of a contractual obligation, made to the obligee, is binding if . . . the promisor should reasonably expect the promise to induce action or forbearance of a substantial character on the part of the promisee . . . and the promise does induce such action or forbearance." Id. at 345, citing 1 Restatement (Second), Contracts § 88 (1981)(footnote omitted).

As of November 16, 2004, LesCare Kitchens owed Stiles and its affiliates $412,929.25, at which time LesCare was in dire financial condition despite Lestorti's personal infusion of over three million dollars into LesCare that year. (Dkt. #78, at 22, 37, 94-95, 108-09; Dkt.

#79, at 61, 67-69, 75, 186; Exhs. 10,12-13, 20-21; see Exh. 8).[35]  At that point, LesCare

Kitchens was on notice that legal proceedings were looming on the horizon if LesCare did not

remit payment on the unpaid debt owed to Stiles, or otherwise "satisfy Stiles' concern over

[LesCare's] lack of payment." (See Dkt. #77, at 65-70; Dkt. #78, at 105).  Lestorti was aware

that signing the Guaranty would result in Stiles' forbearance of suit, and forbearance from suit

is valid consideration as  Stiles had a valid and enforceable claim for payment of the

outstanding debt.  See Martin Printing, 89 Conn. App. at 345-47; Iseli Co. v. Conn. Light &

Power Co., 211 Conn. 133, 136 (1989).[36]

### B. COUNT TWO - ACTUAL FRAUDULENT CONVEYANCE

CONN. GEN. STAT. § 52-522e(a) provides, in relevant part, that "[a] transfer made or

obligation incurred by a debtor is fraudulent as to a creditor, . . . if the debtor made the

transfer or incurred the obligation: (1) With actual intent to hinder, delay or defraud any

creditor of the debtor. . . ."  Plaintiff bears the burden of proving, "by clear, precise and

unequivocal evidence," "either: (1) that the conveyance was made without substantial

consideration and rendered the transferor unable to meet his obligations; or (2) that the

conveyance was made with a fraudulent intent in which the grantee participated."  Tyers v.

Coma, 214 Conn. 8, 11 (1990)(citations & internal quotations omitted).  Plaintiff "need not

satisfy both alternatives."  Id. (citation omitted).   It is for this Court to decide whether a

fraudulent conveyance took place, as such a conveyance is "purely a question of fact." Id.

(citation omitted); see also Nat'l Loan Investors, L.P. v. World Props., LLC, 79 Conn. App. 725,

---

[35]The Note is for $412,949.25 and Muehlbauer's original tally was for a total of $347,624.82.

[36]Additional consideration lies in the revision of the terms of the Note to terms that were more favorable to LesCare Kitchens and Lestorti.  (Dkt. #77, at 72-73).

731 (Conn. App. Ct. 2003)(citations & internal quotations omitted), <u>certif. denied</u>, 267 Conn. 910 (2004).  Actual fraud is "not ordinarily proven by direct evidence, but rather, by inference from other facts proven," including, "the circumstances of the transfer . . . and the conduct and action of the defendants with respect to the possession, management and control of the premises after the date of the conveyance."  <u>Boyd v. Hoffman (In re Boyd)</u>, 264 B.R. 62, 66 (Bankr. D. Conn. 2001)(citation, internal quotations & original alteration omitted).

_____ Defendants contend that because defendant Builtmore Homes, LLC took title to the Avon property from Lestorti, subject to the prejudgment attachment, Builtmore Homes may not object to the filing of a judgment lien on the property which may result if defendant Lestorti fails to satisfy the judgment in a timely fashion.  (Dkt. #81, at 9).  According to defendants, Lestorti "made an open and obvious transfer of the property to . . . Builtmore Homes, LLC, by recording a deed on the Avon land records . . . after the attachment had been filed against the parcel by . . . [p]laintiff [,] and . . . expressly subject to the attachment."  (Dkt. #86, at 14).    Plaintiff argues that two days after Stiles attached Lestorti's 48 Northington Drive property, Lestorti transferred the property to Builtmore Homes "without receiving a reasonably equivalent value in exchange for the transfer in an attempt to avoid Stiles placing an attachment on said property."  (Dkt. #83, at 33; Dkt. #85, at 8-9; <u>see</u> Exhs. 33-34).

As stated above, on May 31, 2005, this Court granted plaintiff's Application for Prejudgment Remedy in the amount of $420,000.  (Dkt. #24).  On that same day, this Court also granted plaintiff's Motion to Disclose Assets and ordered defendant to disclose assets on or before June 17, 2005, which he did not do until January 9, 2006.  (<u>See</u> Exh. 47; <u>see also</u> Exh. 41).  Lestorti testified that Builtmore Homes became a limited liability company in Spring 2005 and on June 19, 2005, upon the advice of counsel, Lestorti quit-claimed his 48

Northington Drive[37] property to Builtmore Homes because the property was to be used as a model home for a real estate venture. (Dkt. #79, at 91-93; <u>see</u> Exh. 33).[38]  According to Lestorti, although his counsel suggested that he quitclaim the property because Lestorti was concerned with "liability issue[s] with people working in [his] house," Lestorti never insured the property.  (Dkt. #79, at 99-100, 207).  Lestorti continues to hold the mortgage for the property.  (Dkt. #79, at 97).  Two days prior to the transfer of the title, plaintiff's counsel filed a Certificate of Attachment of Real Estate in the amount of $420,000, for the 48 Northington Drive property, entitled on the map on file in the Avon Town Clerk's Office as "Plan of Resubdivision 'Garnett Hill Phase-2' . . . Northington Drive & Garnet Hill Lane Avon, Connecticut . . . ." (Exh. 34)(emphasis omitted).  According to Lestorti, Builtmore Homes took title and ownership of the 48 Northington Drive property subject to the lien that was filed on Garnett Hill.  (Dkt. #79, at 96-97).

While the timing of the transfer of the property to Builtmore Homes is suspect and Lestorti's purported reasons for transferring the title of this property were never satisfied, plaintiff has not satisfied its burden, "by clear, precise and unequivocal evidence," that the conveyance of the property was made with a fraudulent intent.  <u>See Tyers</u>, 214 Conn. at 11. (citations & internal quotations omitted).  Lestorti's actions with respect to this property were taken on the advice of counsel to limit his exposure and assist in his business venture, and, most importantly, apparently did not leave him unable to satisfy a judgment.[39] The

---

[37]Lestorti testified that the Northington Drive property is referred to as "Garnett Hill" on the Avon tax and land records.  (Dkt. #79, at 94-96).

[38]The real estate venture never came to fruition and, according to Lestorti, the Northington Drive property was "being listed [on the market]" that day (January 18, 2007).  (Dkt. #79, at 102).

[39]Lestorti also testified that he has sufficient assets to pay any judgment in this case: "I can settle in cash today, if I had to."  (Dkt. #79, at 101.  <u>See also</u> Exhs. 41 & 47).

circumstances of the transfer and the conduct of defendant do not establish that Lestorti "made the transfer or incurred the obligation . . . [w]ith actual intent to hinder, delay or defraud any creditor of the debtor. . . ." CONN. GEN. STAT. § 52-522e(a)(1); see Boyd, 264 B.R. at 66.

## C. DAMAGES FOR BREACH OF GUARANTY

Plaintiff is entitled to recover the principal amount of the Note and Guaranty of $412,949.25, plus 5.75% interest accruing per annum, without compounding, beginning November 16, 2004 through January 15, 2005, for total interest in the amount of $3,903.22. Additionally, plaintiff is entitled to prejudgment interest at the statutory rate of 10%, see CONN. GEN. STAT. § 37-3a, on the principal amount and accrued interest of $416,852.46 from the date the Note became due, January 15, 2005. The prejudgment interest totals $116,869.12. Thus, plaintiff's total recoverable damages is: $533,721.58.

## III. CONCLUSION

Accordingly, for the reasons stated above, judgment shall enter in favor of plaintiff and against defendant Lestorti on Count One in the amount of $533,721.58, and judgment shall enter in favor of defendant Builtmore Homes, LLC on Count Two.

Dated at New Haven, Connecticut, this 17th day of July, 2007.


/s/_____
Joan Glazer Margolis
United States Magistrate Judge